[No. 44049-7-I. Division One. August 14, 2000.]

1519-1525 LAKEVIEW BOULEVARD CONDOMINIUM ASSOCIATION, ET AL., *Appellants*, v. APARTMENT SALES CORPORATION, *Defendant*, MICHAEL K. WILLIAMS, ET AL., *Respondents*.

*Rand L. Koler* and *Kevin T. Ireland*, for appellants.

*Linda B. Clapham* (of *Lane Powell Spears Lubersky, L.L.P.*); *Douglas J. Green* (of *Hight Green & Yalowitz*); *Steve H. Goodman* and *Estera Gordon* (of *Graham & Dunn*); and *Mark F. O'Donnell* and *Charles A. Willmes* (of *Preg O'Donnell Sargeant & Gillett, P.L.L.C.*), for respondents.

ELLINGTON, J. — Three condominiums were built on a steep Seattle hillside. After a winter storm, they slid downhill and are now uninhabitable. The condominium owners and the Lakeview Boulevard Condominium Association (Lakeview) brought various claims against the project architect, structural engineer, geotechnical engineer and construction manager (hereinafter, the Contractors). The trial court dismissed all claims against the Contractors as barred by the six-year construction statute of repose.

Under the construction repose statute, if six years have passed from either termination of contractor services or "substantial completion," whichever occurs later, a claim cannot accrue against the Contractors. None of the Lakeview units had been occupied for six years at the time of the slide, but the Contractors' services had terminated and the units were substantially complete more than six years before the slide. The statute therefore applies to bar Lakeview's claims.

Lakeview brings two challenges to the constitutionality of the statute. While Lakeview's arguments have merit, we are constrained by precedent to affirm.

## FACTS

Apartment Sales Corporation (ASC) owned undeveloped property at 1515-1517 Lakeview Boulevard East in Seattle. The property is triangular; its southern and western boundaries slope downward 25 to 35 degrees. Below the property stands Interstate 5.

In 1988, ASC hired architect Stephen Sullivan, d/b/a Stephen Sullivan Architects (Sullivan), to design three or four single family residences on the property. Sullivan retained Gary and Jane Swenson and RSP/EQE, Inc. (col-

lectively, "Swenson") to provide structural engineering services for the project.

ASC also hired Geotech Consultants, Inc. (Geotech) to investigate the subsurface conditions and provide design criteria for the foundation. The City later required Geotech to supervise certain aspects of the construction. ASC hired Martha Rose, d/b/a Rose Construction Management (Rose), to serve as project manager.

Sullivan performed his final services under the contract on June 22, 1990. Swenson performed no services related to the project after early January 1990. After December 21, 1989, Geotech representatives did not visit the site. Geotech submitted its final report on July 16, 1990. Rose performed her final services on the project on September 30, 1990.

In June 1990, ASC signed an exclusive sale and listing agreement with a real estate company. The condominiums were selected as the *Seattle Times/Seattle Post Intelligencer* Home of the Month. To commemorate the award, an open house was held on June 24, 1990. Hundreds of visitors viewed the condominiums that day.

On August 27, 1990, the City of Seattle's Department of Construction and Land Use (DCLU) issued a certificate of occupancy for the Lakeview properties. DCLU cleared the construction permit for the condominiums on September 26, 1990.

On November 19, 1990, Bruce Curnutt and Bruce McLaughlin entered into a purchase and sale agreement for unit 1517, the middle unit. The purchasers commissioned a private engineering firm to inspect and report on the structural, mechanical, and electrical conditions of the unit. Based on those recommendations, the purchasers and ASC amended their contract to require certain repairs, including securing the building to the foundation; the remaining repairs were minor. None of the Contractors performed these tasks. The sale of unit 1517 closed on February 13, 1991.

On June 1, 1991, Frank and Penny Fukui entered into a

purchase and sale agreement with ASC for unit 1519, the northernmost unit. Minor repairs were also required by their agreement, and other minor repairs were made thereafter under a one-year warranty. Again, none of the Contractors performed that work.

On January 21, 1992, Robert Ferguson purchased unit 1515, the southernmost unit. Again, minor repairs were made as a condition of the purchase agreement, and again, none of the Contractors made those repairs.

A severe storm raged during the week before January 3, 1997. On the morning of January 3, the land beneath the units began to slide down the hill. Unit 1519 dropped a vertical distance of approximately four feet. There were concerns that the units would slide all the way to the bottom of the hill and into the piers supporting the freeway, and the police briefly closed I-5. The condominium units were substantially damaged, and are uninhabitable. All three units have since remained vacant.

On February 4, 1997, the Lakeview Boulevard Condominium Association and the owners of each unit (Lakeview) brought suit against ASC,[1] the City of Seattle,[2] and the Contractors. Claims against the Contractors included negligent survey, negligent foundation design, negligent supervision of foundation construction, and negligent construction, particularly of the drainage system.

The Contractors filed motions for summary judgment. The trial court granted the motions on grounds that the construction statute of repose barred Lakeview's claims. The court also granted certification of final judgment under CR 54(b).[3]

---

[1] ASC has since settled with the owners and is not party to this appeal.

[2] Summary judgment was granted in favor of the City of Seattle and that appeal is pending in this court.

[3] Lakeview assigns error to entry of the CR 54(b) certification of finality, and to denial of its motion for reconsideration of summary judgment as to Rose and Geotech. Lakeview provides no briefing on these assignments, and we therefore decline to consider them. *See* RAP 10.3(a)(5); *Ito Int'l Corp. v. Prescott, Inc.*, 83 Wn. App. 282, 288 n.2, 921 P.2d 566 (1996).

## DISCUSSION

### Construction Statute of Repose: Applicability

■■ The first question we must decide is whether the construction statute of repose applies to bar Lakeview's claims. That statute, RCW 4.16.310, provides:

> All claims or causes of action as set forth in RCW 4.16.300 shall accrue, and the applicable statute of limitation shall begin to run only during the period within six years after substantial completion of construction, or during the period within six years after the termination of the services enumerated in RCW 4.16.300, whichever is later. The phrase "substantial completion of construction" shall mean the state of completion reached when an improvement upon real property may be used or occupied for its intended use. Any cause of action which has not accrued within six years after such substantial completion of construction, or within six years after such termination of services, whichever is later, shall be barred; *Provided*, That this limitation shall not be asserted as a defense by any owner, tenant or other person in possession and control of the improvement at the time such cause of action accrues. The limitations prescribed in this section apply to all claims or causes of action as set forth in RCW 4.16.300 brought in the name or for the benefit of the state which are made or commenced after June 11, 1986.[4]

Lakeview argues the phrase "termination of services" means that a claim against any person who provided an enumerated service is not barred until six years after the termination of all enumerated services by all providers. Thus, Lakeview argues that since services were performed at the homeowners' request "well into 1992," the statute

---

[4] RCW 4.16.300 refers to the following causes of action:

[A]ll claims or causes of action of any kind against any person, arising from such person having constructed, altered or repaired any improvement upon real property, or having performed or furnished any design, planning, surveying, architectural or construction or engineering services, or supervision or observation of construction, or administration of construction contracts for any construction, alteration or repair of any improvement upon real property. This section is intended to benefit only those persons referenced herein and shall not apply to claims or causes of action against manufacturers.

does not bar Lakeview's claims even though none of those services were provided by the named Contractors. But Lakeview's interpretation would render the alternative trigger for the running of the statute ("substantial completion") superfluous.[5] If all services must have terminated before the six-year period begins to run, there could be no services left to perform that would move a project from a state of "substantial completion" to full completion. For contractors performing those final services, therefore, the statute runs from the date the last service was provided; for the others, it runs from the date of substantial completion.

Regarding the date of substantial completion, Lakeview argues the Legislature intended the period of repose to begin when the improvement is sold, so that the occupant would benefit from the full six-year period before losing the right to file a claim against a contractor. Lakeview thus argues that substantial completion cannot occur before sale. Because the Lakeview homeowners all purchased their units less than six years before the landslide, Lakeview argues their claims are not barred.

In support of this argument, Lakeview relies on a discussion on the Senate floor prior to passage of the statute. Senator Uhlman, responding to a question from Senator Guess, indicated that the Senate Judiciary Committee intended termination of services or substantial completion, " 'whichever is later,' " to ensure that " 'tenants had moved in and had a chance to find out any errors or omissions. . . .' "[6] The bill as passed included the "whichever is later" language.

■■ Nothing in the statute indicates, however, that its

---

[5] We interpret and construe statutes so that all the language used is given effect and no portion rendered meaningless or superfluous. *See City of Seattle v. Department of Labor & Indus.*, 136 Wn.2d 693, 701, 965 P.2d 619 (1998).

[6] *Smith v. Showalter*, 47 Wn. App. 245, 249-50, 734 P.2d 928 (1987) (quoting SENATE JOURNAL, 40th Leg. 995 (Wash. 1967). We note that this expression of legislative intent is consistent with our holding on the preceding issue, that is, that the "termination of services" calculation for the period of repose is determined by the date the individual contractor concluded work on the project. *See Showalter*, 47 Wn. App. at 249-50 (quoting SENATE JOURNAL, 40th Leg. 995 (Wash. 1967)).

protections depend on sale of the improvement; obviously many improvements to land are made that are not sold.[7] Instead, the statute defines "substantial completion" as "the state of completion reached when an improvement upon real property *may be used or occupied for its intended use*."[8] Courts look to legislative intent when a statute is ambiguous, not when its language is plain,[9] and on this question the statute is not ambiguous.[10] The Legislature's use of the phrase "may be used" instead of "is used" plainly means that actual use or occupancy is not required for construction to be substantially complete. While the Senator's statement suggests the Legislature contemplated actual use or occupancy as a component of substantial completion, that concept did not find its way into the statute, and we may not supply terms the Legislature chose to omit.

■ Lakeview next argues that because the improvement was a condominium, and under the Washington Condominium Act, an owner's association is to be organized no later than the date the first unit is conveyed,[11] the improvement could not be used for its intended purpose until early 1991 when the association was formed. But Lakeview provides no citation to the 1200-plus page record as to when the association was formed. In any event, the purpose of an owner's association is to clarify the rights and responsibilities of the owners, matters unrelated to whether a new building is ready for occupancy. We need not decide whether the association requirement could *ever* be relevant to fixing

---

[7] *See e.g. Jones v. Weyerhaeuser Co.*, 48 Wn. App. 894, 741 P.2d 75 (1987) (owner contracts for construction of dock, statute applies to immunize contractors from injuries to third party when dock collapses).

[8] RCW 4.16.310 (emphasis added).

[9] *Duke v. Boyd*, 133 Wn.2d 80, 86, 942 P.2d 351 (1997).

[10] Lakeview relies upon *Holy Family Catholic Congregation v. Stubenrauch Assocs., Inc.*, 136 Wis. 2d 515, 402 N.W.2d 382 (Ct. App. 1987), which is inapposite. The Wisconsin Court of Appeals there found the statute of repose ambiguous because "substantial completion" was not defined. *Holy Family*, 402 N.W.2d at 385.

[11] RCW 64.34.300.

the date of substantial completion. But certainly, it is not controlling here, and we decline to read the requirements of the Condominium Act into the statute of repose.

■ Lakeview also argues the trial court erred in holding that issuance of the certificate of occupancy by the City of Seattle established the date of substantial completion. The court actually mentioned two events: "In this case, substantial completion, I believe, did occur when the condos were being marketed and a certificate of occupancy had been issued." We agree that in this case, at the point both events had occurred in August 1990, the project was substantially completed. Only "punch list" items remained, and the record does not indicate that work yet unfinished rendered the project not substantially complete, i.e., not fit for occupancy. The fact that additional work was done later by contract with the purchasers does not alter the fact that in August 1990 the project was substantially complete.

■ Finally, Lakeview makes two arguments specific to Geotech. First, Lakeview argues Geotech cannot claim the protection of the statute because its services fall outside the statute's scope, since its report was issued before any construction began, and its conclusions were "geological" in nature. This argument was not made to the trial court, and we therefore decline to consider it.[12] We note, however, that the statute does not distinguish between services provided before or after construction; the statute applies to claims arising from providers of "engineering services"; and Lakeview's complaint characterizes Geotech's services as "geotechnical engineering."

Second, Lakeview alleges that Geotech fraudulently concealed defects in the subsurface drainage system, and that such concealment tolls the statute of repose. Whether fraudulent concealment has the effect of tolling the statute is an unsettled question.[13] We need not resolve the question

---

[12] RAP 9.12; *Washington Fed'n of State Employees, Council 28 v. Office of Fin. Management*, 121 Wn.2d 152, 157, 849 P.2d 1201 (1993).

[13] *See Pfeifer v. City of Bellingham*, 112 Wn.2d 562, 570-71, 772 P.2d 1018 (1989).

here, however, because Lakeview submitted no evidence that Geotech concealed anything. Lakeview's dissatisfaction with the level of detail in summary reports about Geotech's inspection of footing drains is not enough to raise a question of concealment where Geotech submitted field reports describing what was seen and what was inferred. Nor did Geotech's original report on the stability of the slope amount to fraudulent concealment. Lakeview essentially argues that the report was wrong, which is the gravamen of its negligence claim but not evidence of fraud.

Lakeview thus establishes no basis for any approach other than the straightforward application of the statute employed by the trial court. The project was substantially complete in August 1990, and the last of the Contractors terminated its services in September 1990. When Lakeview's claims arising from the Contractors' improvements accrued on January 3, 1997, more than six years had passed since both substantial completion of construction and termination of each Contractor's services. The statute of repose therefore applies to bar Lakeview's claims.

Construction Statute of Repose: Constitutional Challenges

Lakeview makes two constitutional challenges to the statute. First, Lakeview argues the construction statute of repose violates fundamental rights of access to the courts under article I, section 10 of the Washington Constitution, because it extinguishes rights before they accrue and thereby denies a remedy. Second, Lakeview argues the statute violates the privileges and immunities clause of the state constitution and the equal protection guarantee of the federal constitution.

Regarding access to the courts, Lakeview's basic premise is that legislation which is destructive of a remedy available at common law denies the fundamental right of access to a judicial remedy.[14] Our Supreme Court has held

---

[14] A statute of repose differs from a statute of limitations in that the former terminates a right of action even if no injury has occurred. *See Rice v. Dow Chem.*

that access to the courts is a fundamental right.[15] The provisions upon which that right is grounded are not entirely clear; as one commentator observed, "the Washington Supreme Court has been sure of the right of access, but unsure of its constitutional source."[16] In *Carter v. University of Washington*, the Court founded the right upon article I, section 4 (right of petition).[17] The following year, however, that aspect of the holding was overruled in *Housing Authority v. Saylors*,[18] wherein the Court held that article I, section 4 preserves citizens' rights to political access, not to the courts:

> *Carter v. University of Washington* . . . should . . . be overruled insofar as it suggested that article I, section 4, protects a right of access to the courts. . . . This provision obviously has reference to the exercise of political rights. . . . It requires an awkward and unnatural construction of this language to make it applicable to the judicial process. Access to the courts is amply and expressly protected by other provisions.[19]

The *Saylors* court did not question the *Carter* holding that access to the courts is a fundamental right, but neither did it identify any of the "other provisions" protecting that right.

Commentators have suggested that Washington's guarantee of meaningful access to the courts does include the right to seek a judicial remedy for a wrong, and that the right to a remedy is founded upon one or more provisions of

---

*Co.*, 124 Wn.2d 205, 211-12, 875 P.2d 1213 (1994).

[15] *Carter v. University of Wash.*, 85 Wn.2d 391, 393-94, 536 P.2d 618 (1975), *overruled in part by Housing Auth. v. Saylors*, 87 Wn.2d 732, 741-42, 557 P.2d 321 (1976).

[16] Janice Sue Wang, Comment, *State Constitutional Remedy Provisions and Article I, Section 10 of the Washington State Constitution: The Possibility of Greater Judicial Protection of Established Tort Causes of Action and Remedies*, 64 WASH. L. REV. 203, 216 (1989).

[17] *Carter v. University of Wash.*, 85 Wn.2d 391, 398, 536 P.2d 618 (1975), *overruled in part by Housing Auth. v. Saylors*, 87 Wn.2d 732, 557 P.2d 321 (1976).

[18] 87 Wn.2d 732, 557 P.2d 321 (1976).

[19] *Saylors*, 87 Wn.2d at 741-42.

the state constitution:[20] article I, section 3 (due process);[21] article I, section 10 (open administration of justice);[22] article I, section 12 (privileges and immunities);[23] article I, section 32 (fundamental principles);[24] article II, section 28 (prohibition against special legislation);[25] and those article IV sections establishing courts' jurisdiction.[26]

Despite references to "provisions" (plural),[27] no opinion since *Carter* has identified a source for the right of access other than article I, section 10, the "open courts" provision, upon which Lakeview relies. The Court has considered article I, section 10 right of access in various contexts, including the public's access to information regarding the judicial process and its litigants;[28] an indigent's right to

[20] *See* C.K. Wiggins, et al., *Washington's 1986 Tort Legislation and the State Constitution: Testing the Limits*, 22 Gonz. L. Rev. 193, 202, 216 (1986/87); Wang, *supra* note 17, at 216-17.

[21] "No person shall be deprived of life, liberty, or property, without due process of law." Wash. Const. art. I, § 3.

[22] "Justice in all cases shall be administered openly, and without unnecessary delay." Wash. Const. art. I, § 10.

[23] "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." Wash. Const. art. I, § 12.

[24] "A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." Wash. Const. art. I, § 32.

[25] "The legislature is prohibited from enacting any private or special laws in the following cases: . . . 17. For limitation of civil or criminal actions." Wash. Const. art. II, § 28.

[26] *See* Wiggins, *supra* note 21, at 202. Wiggins does not identify specific article IV sections.

[27] For example, the Supreme Court held the medical malpractice statute of repose violated article I, section 12 (equal protection), and so declined to consider whether it also violated "access to the courts provisions of the state constitution." *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 150, 960 P.2d 919 (1998).

[28] *See Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 848 P.2d 1258 (1993) (statute prohibiting disclosure of information on child victims of sexual abuse violates article I, section 10); *Seattle Times Co. v. Eberharter*, 105 Wn.2d 144, 713 P.2d 710 (1986) (article I, section 10 does not provide a public right of access to a search warrant affidavit in an unfiled criminal case); *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 640 P.2d 716 (1982) (to determine whether to restrict public's access to criminal hearings or records, trial court must not only balance

representation at public expense;[29] and a litigant's right to information in the discovery process.[30]

None of the article I, section 10 cases considered whether legislative abrogation of a remedy invokes the protections of article I, section 10.[31] But in a case decided in 1936, the Supreme Court considered and rejected the argument that the state Constitution guarantees a remedy at law. In *Shea v. Olson*,[32] the Court considered whether the state constitution's provisions of due process (article I, section 3) or privileges and immunities (article I, section 12) prohibited legislative abolition of common law rights and held: "Assuming that at common law respondent would have had a right of action, the rule upon which such right was founded was changed by the Legislature, which it had the right to do. A person has no vested interest in any rule of the common law."[33] While the Court did not consider every section enumerated by the commentators, the Court expressed its holding in broad terms: "There is, therefore, no express, positive mandate of the Constitution which preserves such rights of action from abolition by the Legisla-

---

criminal defendant's Sixth Amendment right to a fair trial with the right of free speech, but must preserve such rights).

[29] *See Miranda v. Sims*, 98 Wn. App. 898, 991 P.2d 681 (2000) (rejecting article I, section 10 challenge to County's denial of representation at public expense at an inquest proceeding).

[30] *See Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 819 P.2d 370 (1991) (litigant's constitutional right to access the courts carries considerable weight when balancing the public and private interests relevant to determining the necessity of a protective order under CR 26(c)).

[31] The *Doe* court took pains to distinguish the issue:

It is important to note that our consideration here is of the right of *access*. We are not here considering the validity of a theory of recovery. We are not considering legislative or judicial creation or abolition of a cause of action. We are not considering the abrogation or diminishment of a common law right. These are all issues for other cases.

*Doe*, 117 Wn.2d at 781.

[32] 185 Wash. 143, 53 P.2d 615 (1936) (guest passenger statute limiting liability of driver upheld as not violative of article I, sections 3 and 12).

[33] *Shea*, 185 Wash. at 156.

ture, even when acting under its police power."[34] The Court distinguished opinions holding otherwise by virtue of express remedy provisions in those states' constitutions.[35]

While commentators urge adoption of the remedy doctrine as a fundamental aspect of meaningful access to the courts, a proposition which seems to us sound, Lakeview makes no reasonable articulation of these issues and in any case, *Shea* precludes adoption of the remedy doctrine except by the Supreme Court itself. We must defer to the holding of our highest court.[36]

Lakeview also asserts that the construction statute of repose violates the equal protection clause of the Fourteenth Amendment to the U.S. Constitution[37] and the privileges and immunities clause (article I, section 12) of the Washington Constitution[38] because the statute omits from its protections owners, tenants, manufacturers, and any other person not referenced therein, and is therefore underinclusive.[39] This too has been previously decided by our Supreme Court.

---

[34] *Shea*, 185 Wash. at 161. *But see Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 426-27, 63 P.2d 397 (1936) (Tolman, J., concurring).

[35] *Shea*, 185 Wash. at 159-61. For the same reason, Lakeview's reliance on *Overland Construction Co. v. Sirmons*, 369 So. 2d 572 (Fla. 1979) is misplaced.

[36] *State v. Hairston*, 133 Wn.2d 534, 539, 946 P.2d 397 (1997).

[37] "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

[38] "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." WASH. CONST. art. I, § 12.

[39] The Contractors question Lakeview's standing to challenge the statute on equal protection grounds because Lakeview is not a defendant unable to assert the defense. Because of our disposition, we do not reach the standing issue. We note that several courts have held that plaintiffs in Lakeview's position have standing. *See, e.g., Sandoe v. Lefta Assocs.*, 559 A.2d 732, 736 n.4, (D.C. 1988); *McClanahan v. American Gilsonite Co.*, 494 F. Supp. 1334, 1342-44 (D. Colo. 1980); *Turner Constr. Co. v. Scales*, 752 P.2d 467, 470 (Alaska 1988); *Shibuya v. Architects Haw. Ltd.*, 65 Haw. 26, 647 P.2d 276, 282 (1982); *Krull v. Thermogas Co.*, 522 N.W.2d 607, 613 (Iowa 1994); *Klein v. Catalano*, 386 Mass. 701, 437 N.E.2d 514, 522-23 (1982); *Funk v. Wollin Silo & Equip., Inc.*, 148 Wis. 2d 59, 435 N.W.2d 244, 248 (1989); *but see Patel v. Fleur De Lis Motor Inns, Inc.*, 771 F. Supp. 961, 966 (S.D. Iowa 1991).

In *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.*,[40] the Court held the construction statute of repose does not violate the equal protection clause of the Fourteenth Amendment or article I, section 12. The Court's analysis is confined to rejection of the holding in *Skinner v. Anderson*,[41] where the Supreme Court of Illinois held their construction statute of repose violated that state's privileges and immunities clause because it protected only architects and contractors, and not owners or manufacturers.[42]

The discussion of this issue in *Yakima Fruit* was extremely abbreviated. The Court stated only that Washington's statute was not comparable to that struck down in *Skinner* "because the scope of the Washington provision is not limited as to vocation. The subject statute bars actions against *any person* having constructed, altered or repaired any improvement upon real property."[43] The Court made no mention of the statute's exclusion of owners and manufacturers, and thus seems to have misconstrued the *Skinner* court's holding. The *Yakima Fruit* court undertook no further analysis, and simply concluded: "The court of no other state than Illinois has found its similar statute unconstitutional; nor has the legislature of any state other than Illinois repealed the legislation. The judgment of dismissal is affirmed."[44]

Lakeview contends we are not bound to follow *Yakima Fruit*[45] because the decision relied heavily on the fact that

[40] 81 Wn.2d 528, 532, 503 P.2d 108 (1972).

[41] 38 Ill. 2d 455, 231 N.E.2d 588 (1967).

[42] The Illinois privileges and immunities clause provides: " 'The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: for— * * * Granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever.' " *Skinner*, 231 N.E.2d at 590 (quoting Ill. Const. art. IV, § 22).

[43] *Yakima Fruit*, 81 Wn.2d at 532.

[44] *Yakima Fruit*, 81 Wn.2d at 532.

[45] Lakeview also argues *Yakima Fruit* is not controlling because after that decision, the Legislature added manufacturers to the excluded class. *See* Laws of

until that time, only the *Skinner* court had held a statute of repose violative of equal protection because of underinclusiveness, whereas a considerable number of courts have since reached the same result.[46] (There are thoughtful discussions in several cases, considering various arguments on both sides of this issue.)[47] Lakeview contends the reasoning of those later cases was not clearly rejected in *Yakima Fruit*, and that we are therefore not bound by *Yakima Fruit* because courts do not rely on cases that fail to decide the issue in question.[48]

Lakeview's argument is that the statute fails to satisfy minimum scrutiny, because the classification of those included in its protections does not meet the requirement that there be reasonable distinctions between those within and those outside the class and that they bear a rational relationship to the purpose of the legislation.[49]

Exclusion from the class to which a statute applies must

---

1986, ch. 305, § 703. Lakeview does not explain how this amendment assists us, however, since the *Skinner* holding, rejected in *Yakima Fruit*, was partly premised upon exclusion of manufacturers. *See Skinner*, 231 N.E.2d at 591. In any case, Lakeview offers no argument specific to manufacturers, and we therefore do not separately address that issue. For a discussion of exclusion of manufacturers from repose statutes, *see, e.g., Shibuya*, 647 P.2d at 283.

[46] *See, e.g., Shibuya*, 647 P.2d 276 (no reasonable distinction between members of construction industry and manufacturers; unconstitutional under state equal protection clause but "guided" by federal decisions); *Henderson Clay Prods., Inc. v. Edgar Wood & Assocs., Inc.*, 122 N.H. 800, 451 A.2d 174 (1982) (unreasonable and arbitrary distinction between architects and materialmen violates state and federal equal protection guarantees). *But see, e.g., Burmaster v. Gravity Drainage Dist. No. 2*, 366 So. 2d 1381 (La. 1978) (long tail of liability renders protection of architects and contractors reasonable).

[47] *See, e.g., Krull*, 522 N.W.2d 607 (rational distinction between architects and owners due to defenses available to owners and discovery delays); *Gibson v. West Va. Dep't of Highways*, 185 W. Va. 214, 406 S.E.2d 440 (1991) (cannot fault legislature for protecting architects and builders who were exposed to increased liability when privity of contract abolished). *See also Horton v. Goldminer's Daughter*, 785 P.2d 1087, 1092 n.3 (Utah 1989) (listing cases and constitutional grounds on which courts upheld or found unconstitutional construction statutes of repose).

[48] *In re Registration of Elec. Lightwave, Inc.*, 123 Wn.2d 530, 541, 869 P.2d 1045 (1994).

[49] *DeYoung*, 136 Wn.2d at 144. Lakeview does not argue for a heightened level of scrutiny.

be rationally related to the purpose of the statute.[50] The statute of repose specifically excludes from its protection "owner[s], tenant[s], or other person[s] in possession and control of the improvement at the time such cause of action accrues," and manufacturers.[51]

 The purpose of the statute is to prevent stale claims and place a reasonable time limitation on the personal liability exposure of construction industry defendants.[52] The statute is intended to protect contractors "from the possibility of being held liable for the acts of others. The longer the owner has possession of the improvement, the more likely it is that the damage was the owner's fault or the result of natural forces."[53] The premise for providing such ultimate repose to contractors is the durability of improvements to realty and the resulting "long tail of liability": " 'Without protection such persons would be subject to liability for many years after they had lost control over the improvement or its use or maintenance.' "[54]

According to the Contractors, the opportunity to control the improvement is the "core difference" between those protected and those excluded, because persons in possession have "ongoing rights, control and obligations" and "the opportunity to control a completed improvement," whereas persons who improve real property have "neither the right nor the obligation to ensure that appropriate maintenance is performed." Without the protection of the statute, the Contractors assert, they are subject to liability long after they have relinquished control.

We think this argument entirely misses the mark, mainly

---

[50] *City of Seattle v. State*, 103 Wn.2d 663, 675, 694 P.2d 641 (1985).

[51] RCW 4.16.310.

[52] *Bellevue Sch. Dist. No. 405 v. Brazier Constr. Co.*, 103 Wn.2d 111, 120, 691 P.2d 178 (1984).

[53] *Jones v. Weyerhaeuser Co.*, 48 Wn. App. 894, 899, 741 P.2d 75 (1987).

[54] *New Meadows Holding Co. v. Washington Water Power Co.*, 34 Wn. App. 25, 29, 659 P.2d 1113 (1983), *aff'd in part, rev'd in part*, 102 Wn.2d 495, (1984) (quoting *Nevada Lakeshore Co. v. Diamond Elec. Inc.*, 89 Nev. 293, 511 P.2d 113, 114 (1973)).

because it ignores the circumstances of the owner. "Control" is irrelevant to the "long tail of liability" that accompanies torts of commission or omission in the construction of durable buildings. In the words of the Supreme Court of Wisconsin:

> The reality is that, even without the special interest immunity statute in question here, those in the construction business are not legally liable for injuries that were caused by the errors or omissions of others—those in "control." Control, as envisaged by the statute, is a distinction without relevance.[55]

Where no liability exists, passage of time does not create it. Nor is the evil of stale claims a problem unique to contractors; all parties in construction disaster cases face the problem of lost records, faded memories, intervening events, and absent witnesses.[56]

As the Wisconsin court also noted, one effect of the statute is to extinguish an owner's right of contribution against the architect or contractor.[57] The effect in Washington is the same.[58] Contractors are not liable for the acts of owners, so that for them the fear of a "long tail of liability" for acts of others is unfounded, but the reverse is not true: owners may well have liability to third parties where harm is caused by construction defects revealed after the six-year repose period. Yet the statute extinguishes their rights against the responsible contractors.[59] Thus, the statute provides repose to negligent contractors in order to protect them from an illusory risk, while offering no protection to

---

[55] *Funk v. Wollin Silo & Equip., Inc.*, 148 Wis. 2d 59, 435 N.W.2d 244, 251 (1989). The Supreme Court of Wisconsin has twice found the statute unconstitutional. *See Kallas Millwork Corp. v. Square D Co.*, 225 N.W.2d 454 (1975). The Wisconsin legislature amended its repose statute to explicitly include surveyors and material suppliers within the statute's protection. *Funk*, 435 N.W.2d at 247. Owners and occupiers of land were still in the unprotected class. *Funk*, 435 N.W.2d at 247.

[56] *See Tabler v. Wallace*, 704 S.W.2d 179, 185 (Ky. 1985); *Overland Constr. Co. v. Sirmons*, 369 So. 2d 572, 574 (Fla. 1979).

[57] *Funk*, 435 N.W.2d at 251.

[58] *See Jones*, 48 Wn. App. at 896.

[59] *See Jones*, 48 Wn. App. at 899.

those who actually have a risk—owners or tenants who had no part in creating the harm but who have potential liability for it. The "long tail" attaches to an innocent owner, while the statute immunizes the wrongdoers.[60] The net effect is to shift the risk of defects in construction to owners and tenants unless the defect is discovered within six years.

Since owners and tenants have the same reason to fear the long tail of liability the statute purports to address, we see no reasonable basis for a distinction between owners/occupiers of land on the one hand, and architects and contractors on the other. In our view, the statute's discrimination between owners and contractors bears no rational relationship to the purpose of the legislation.

Lakeview thus may well be correct that in its exclusion of owners and tenants, the construction statute of repose violates both the state privileges and immunities clause and the federal equal protection clause.[61] Lakeview is certainly correct that *Yakima Fruit* offers little analysis in support of its holding to the contrary. But we see no principled basis for distinguishing this case from the holding of *Yakima Fruit*.[62] The *Yakima Fruit* court discussed

---

[60] In *Pfeifer v. City of Bellingham*, 112 Wn.2d 562, 772 P.2d 1018 (1989), the Supreme Court held that while builder-sellers were protected by the statute of repose for their construction activities, they were not protected by the statute for their acts as sellers, and were subject to suit under the RESTATEMENT (SECOND) OF TORTS § 353 for fraudulent concealment of dangerous defects. The Court rejected a special legislation challenge to the statute under article II, section 28(17) of the state constitution, noting: "It could be rational for the Legislature to distinguish between sellers who improve property and those who do not when the purpose of the statute is to provide protection to those who improve property." *Pfeifer*, 112 Wn.2d at 570. This distinction, however, is not at issue here.

[61] The rights guaranteed by the federal equal protection clause and the state privileges and immunities clause are substantially identical, *In re Dependency of Grove*, 127 Wn.2d 221, 239, 897 P.2d 1252 (1995), and Lakeview does not argue for a broader interpretation of the state provision.

[62] We note that an equal protection challenge to the Texas construction statute of repose, where the challenger asserted the statute denied its protections to owners and materialmen, was rejected by the United States Supreme Court as not raising a substantial federal question. *Ellerbe v. Otis Elevator Co.*, 459 U.S. 802, 103 S. Ct. 24, 74 L. Ed. 2d 39 (1982). Such a dismissal rejects the specific challenge made. *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S. Ct. 2238, 53 L. Ed. 2d 199 (1977). The Supreme Court's summary dismissal of *Ellerbe* was relied upon by at least one federal court as controlling authority for the proposition that exclusion

and rejected the *Skinner* decision. The control argument debated by the parties here was one of the grounds for the *Skinner* court's decision, and the *Skinner* court's reasoning was adopted in *Funk*[63] and other cases cited by Lakeview. While the *Yakima Fruit* court's discussion of *Skinner* is most notable for what it omits, brevity is not the test for identifying controlling precedent. We cannot fairly characterize *Yakima Fruit* as a case that failed to decide the issue before us, and therefore we must follow it.

Lakeview also points to the recent opinion of our Supreme Court holding that the medical malpractice statute of repose violates equal protection principles because "[t]he relationship between the goal of alleviating any medical insurance crisis and the class of persons affected by the eight-year statute of repose is too attenuated to survive rational basis scrutiny."[64] The *DeYoung* court found that given the number of claims precluded by the statute (less than one percent), the repose provision "could not possibly have any meaningful impact on the medical malpractice insurance industry . . . ."[65]

Attempting a similar comparison, Lakeview calls our attention to a law review article which quotes information submitted to the U.S. Congress the year the Washington repose statute was adopted.[66] According to a study quoted in the article, 93 percent of all negligence claims against architects are brought within six years of the termination of their services, and 99.6 percent are brought within 10

---

of owners, occupants and operators of improvements to real property from a construction statute of repose does not violate federal equal protection guarantees. *See Patel v. Fleur De Lis Motor Inns, Inc.*, 771 F. Supp. 961, 969 (S.D. Iowa 1991).

[63] *Funk v. Wollin Silo & Equip., Inc.*, 148 Wis. 2d 59, 435 N.W.2d 244 (1989).

[64] *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 149, 960 P.2d 919 (1998).

[65] *DeYoung*, 136 Wn.2d at 149.

[66] *See* Margaret A. Cotter, Comment, *Limitations of Action Statutes for Architects and Builders—Blueprints for Non-Action*, 18 Cath. U. L. Rev. 361, 366-67 (1969). The Contractors' motion to strike the portion of Lakeview's reply brief containing this material is discussed *infra*.

years.[67] Considering the percentage of foreclosed claims as a measure of whether the legislative classification for a statute of repose is rationally related to the legislative purpose may not always be appropriate, but applying that measure here does not yield the result Lakeview suggests. In *DeYoung*, the Court concluded that the "minuscule" number of claims eliminated by the repose statute was too small (i.e., less that one percent) to accomplish the legislative objective of alleviating a perceived insurance crisis.[68] The facts are different here. If the only question is whether the statute eliminates a sufficient number of claims to satisfy the purpose of providing ultimate repose for contractors, the Legislature could rationally decide to eliminate the seven percent of claims that apparently accrue after the sixth year, and we cannot say that seven percent is minuscule.

While the argument considered and accepted in *DeYoung* was not decided in *Yakima Fruit*, and is therefore properly before us, we must reject it as applied to these facts and on this record.

■ Accordingly, we must hold that under controlling Washington precedent, the construction statute of repose does not violate the privileges and immunities clause or equal protection guarantees.

## Issues of Fact as to Rose and Geotech

Because we conclude the construction statute of repose may be asserted by the Contractors and bars Lakeview's claims, we do not reach Lakeview's argument that issues of fact remain to preclude summary judgment as to Rose and Geotech.

## Motions to Strike

In this court, Lakeview moved to strike the amicus brief

---

[67] One court considered this information, and held that a 10-year statute of repose drew a "reasonable and rational balance between the rights of an injured plaintiff and the need to fix some outer time limit on liability for those engaged in designing and constructing improvements to real property." *Gibson v. West Virginia Dep't of Highways*, 406 S.E.2d 440, 447 (W. Va. 1991).

[68] *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 150, 960 P.2d 919 (1998).

of Associated General Contractors (AGC) on grounds that the brief was submitted less than 30 days before oral argument in violation of RAP 10.2(f). Lakeview's motion is well taken. RAP 10.2(f) requires a brief of amicus curiae not requested by this court be submitted not later than 30 days before oral argument. AGC submitted its brief on December 30, 1999. Oral argument was set for January 24, 2000. We strike the AGC amicus brief because its submission was untimely under RAP 10.2(f), and permission to file was improvidently granted.

The Contractors moved to strike a portion of Lakeview's reply brief on the grounds that those portions were based on factual assertions and authority not submitted below. We deny the motion because the dispute concerns contents of a law review article.[69]

Affirmed.

BAKER and KENNEDY, JJ., concur.

---

[69] *See* Margaret A. Cotter, Comment, *Limitations of Action Statutes for Architects and Builders—Blueprints for Non-Action*, 18 CATH. U. L. REV. 361 (1969).